IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PARALLEL NETWORKS LICENSING, LLC,

    Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

    Defendants.

Civil Action No. 13-2072 (KAJ)

**REDACTED – PUBLIC VERSION**

MEMORANDUM OPINION

Adam W. Poff, Esq., Pilar G. Kraman, Esq., Young Conaway Stargatt & Taylor, 1000 N. King Street, Wilmington, DE 19801, *Counsel for Plaintiffs*
    Of Counsel:    Douglas A. Cawley, Esq., Christopher T. Bovenkamp, Esq., Eric S. Hansen, Esq., Avery R. Williams, Esq., Justin W. Allen, Esq., McKool Smith, PC, 300 Crescent Court – Ste, 1500, Dallas, TX 75201
Angela M. Vorpahl, Esq., McKool Smith, PC, 1 Bryant Park – 47th Fl., New York, NY 10036
John B. Campbell, Esq., Leah Bhimani Buratti, Esq., Kevin P. Hess, Esq., McKool Smith, PC, 300 W. 6th Street – Ste. 1700, Austin, TX 78701

Jack B. Blumenfeld, Esq., Rodger D. Smith, II., Esq., Jeremy A. Tigan, Esq., Morris, Nichols, Arsht &Tunnell, LLP, 1201 North Market Street, P.O.. Box 1347, Wilmington, DE 19899, *Counsel for Defendants*
    Of Counsel:    John M. Desmarais, Esq., Jon T. Hohenthaner, Esq., Andrew G. Heinz, Esq., Jeffrey S. Seddon, II, Esq., William D. Findlay, Esq., Desmarais LLP, 230 Park Avenue, New York, NY 10169

April 17, 2017
Wilmington, Delaware


JORDAN, Circuit Judge, sitting by designation

I.  **Introduction**

On February 22, 2017, I entered a summary judgment order excluding Parallel Networks' theory of indirect infringement. (Docket Item ("D.I.") 367.) At the same time, I denied as moot a motion filed by IBM pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), that sought to exclude the testimony of Mr. John R. Bone (Parallel Networks' damages expert) relating to Parallel Networks' theory of indirect infringement. Shortly after I entered that order, IBM filed a motion in limine seeking to exclude all testimony from Mr. Bone. (D.I. 382 Ex. 6 at 14.) That motion is the subject of this opinion.[1]

After the entry of partial summary judgment, IBM learned that Parallel Networks intended to use Mr. Bone's report to support a damages theory relating to the alleged direct infringement by IBM of the asserted patent claims via IBM's use of its website, IBM.com.[2] (D.I. 390 (Tr.)[3] at 30-31 ("[S]o we call Parallel Networks after the summary judgment ruling and we say we assume ... that you won't be calling Bone because he has no opinion on damages for IBM.com, [but] they say no, we're going to call him, he did

---

[1] Originally, IBM filed a Motion for Leave to File a Second Motion to Exclude the Expert Testimony of John R. Bone (D.I. 374). Later, by letter, it included its motion to exclude in the Pretrial Order (*see* D.I. 382 Ex. 6).

[2] I describe the asserted claims and the accused products in my memorandum opinion on summary judgment. (D.I. 366.)

[3] I heard oral argument on this motion at the pre-trial conference on March 13, 2017. (D.I. 390.)

discuss IBM.com.").) The parties now dispute whether Mr. Bone offered an opinion on damages related to such infringement, and, if Mr. Bone did offer that opinion, whether the opinion satisfies the requirements of *Daubert* and Federal Rule of Evidence 702.

At the pre-trial conference, I expressed my preliminary views that Mr. Bone had not offered an opinion on damages related to that theory of direct infringement (*id.* at 41) and that IBM had "ma[de] a pretty strong *Daubert* case" (*id.* at 42). However, because the first round of motion-in-limine briefing was limited to only a few pages, I elected to give Parallel Networks a chance to more fully brief the significant issues in play. (*Id.* at 41 ("I want to give you a chance to more fully brief both [issues.]".)

Having now reviewed the briefing and given the matter further consideration, I conclude that Mr. Bone did not offer an opinion on damages relating to IBM's use of its website and that any opinion he now purports to offer does not satisfy the requirements of *Daubert* and Rule 702.

## II. Legal Standards

### A. Adequate Disclosure

Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that expert reports contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" "If a party fails to provide information ... as required by Rule 26(a) ... the party is not allowed to use that information ... at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Coal. to Save Our Children v. Bd. of Educ. of Del.*, 90 F.3d 752, 775-76 (3d Cir. 1996) (concluding that the district court did not abuse its discretion when it excluded undisclosed, "surprise" expert

3

testimony). Together, Rules 26 and 37 provide trial courts with discretion to exclude opinions that are not disclosed in expert reports. *Johnson v. Vanguard Mfg., Inc.*, 34 Fed. App'x 858, 859 (3d Cir. 2002) ("A party that fails to disclose evidence required by Rule 26(a) will not be allowed to use that evidence unless the failure to disclose the evidence is harmless."); *Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 614-15 (D. Del. 2007) (granting motion to exclude an opinion that was not disclosed in an expert report); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 297 (3d Cir. 2012) ("A plaintiff omits evidence necessary to sustain a damages award at its own risk."). Adequate disclosure is important because it enables other parties to prepare for cross-examination, to seek other expert opinions, and to prepare their litigation positions. *E.g., Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010).

### B. Expert Evidence

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Under that rule, expert testimony is admissible only if it "will help the trier of fact to understand the evidence[,] ... is based on sufficient facts or data[,] ... is the product of reliable principles and methods[,] and ... reliably applie[s] the principles and methods to the facts of the case." Fed. R. Evid. 702. The role of the district court is to serve as a "gatekeeper" – to protect the jury from evidence that is unreliable, confusing, or unduly prejudicial. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145, 147-48 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-92 (1993). There must, in that regard, be both reliable methodology in the analysis and an adequate "fit" between the offered expert opinion and the facts at issue in the case. *Daubert*, 509 U.S. at 591

4

(quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Expert conclusions that do not have an adequate analytical connection to the facts are excludable. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Pursuant to Federal Rule of Evidence 104, the burden of proof with respect to fit and reliability under Rule 702 lies on the party attempting to offer the expert evidence. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

### III. Discussion

#### A. Mr. Bone's First Report Does Not Adequately Reveal an Opinion on Damages Relating to Direct Infringement

A review of Mr. Bone's expert report reveals no developed damages theory that pertains to the theory of direct infringement that Parallel Networks now advances. Parallel Networks claims that IBM directly infringed the asserted claims through the operation of IBM's website, www.IBM.com. Mr. Bone, however, focused his damages theories on indirect infringement, as his report shows.

First, his report contains language that functionally limits the scope of his opinion to indirect infringement. The most important example of that is in his analysis of the first *Georgia-Pacific* factor. That factor involves "[t]he royalties received by the patentee for

5

the licensing of the patent in suit, proving or tending to prove an established royalty."
*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).
When conducting his analysis of that factor, Mr. Bone excluded as irrelevant a license relating to "end users that were accused of infringing the patents-in-suit in connection with the operation of their respective Web site." (D.I. 392 Ex. 2 at 60.) He reasoned that those licenses were irrelevant because the licensees did not have ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.*) That language shows that Mr. Bone's damages analysis was directed to licenses to *sell* infringing products rather than on licenses to *use* infringing products and so was not directed to IBM's use of its own website.

Second, the methodology Mr. Bone uses in his report to arrive at his damages estimate is rooted in IBM's sale of the accused products. Generally speaking, Mr. Bone looked at the profit IBM received from the sale of its products, attributed a percentage of that profit to the patented features of the products, and used that percentage to arrive at a damages estimate. (*See id.* at 96-100.) More concretely, Mr. Bone concluded that (1) IBM realized ▓▓▓▓▓▓▓▓ of profit from sales of WebApplication Sphere products (*id.* at 96), (2) 65% of those profits could be attributed to the infringing features, yielding an "indication of value ▓▓▓▓▓▓▓▓" (*id.*), (3) IBM realized a "net present value gross profit of ▓▓▓▓▓▓" from sales of its DataPower products (*id.* at 97), (4) ▓▓▓▓▓▓ of those profits can be attributed to the patents in suit (*id.* at 99-100), yielding a total figure of ▓▓▓▓▓▓ (*id.* at 107). Mr. Bone went on to assert that his damages estimate could increase "to ▓▓▓▓▓▓ if Accused Non-U.S. Sales are found to infringe the patents-in-suit." (*Id.* at 107.) Thus all of the value included in Mr. Bone's estimate

6

relates to IBM's sale of the accused products, rather than to IBM's operation of www.IBM.com. While Mr. Bone offered two "alternative" damages theories, his estimates under those theories are also derived exclusively from sales of the accused products. (*See id.* at 107-08.) During his deposition, he accepted this summary of his opinion:

> Q. Beyond those three [theories presented in your report], do you have any other opinions on reasonabl[e] royalties or alternatives or checks in your report?
>
> A. In terms of the ultimate conclusion, no... .

(D.I. 392 Ex. 4 at 179.)

Parallel Networks of course disagrees with that view of the record and argues that Mr. Bone's expert report "included a reasonable royalty analysis of IBM's internal use of the accused products in IBM.com." (D.I. 391 at 1.) But that is not accurate. While it is true that Mr. Bone asserted that IBM directly infringed the asserted claims and that IBM benefitted from its use of the accused products, he did not actually present a damages theory based on the use of IBM.com. He does not explain how one would quantify the value IBM realized by any such infringement, and he does not indicate how the value derived from use would translate into a royalty or license agreement.[4]

---

[4] To be clear, Mr. Bone does comment on the amount of revenue IBM earned through its website, as well as how much revenue might be lost if the website were taken offline or if IBM encountered slower server speeds. He states: "To the extent that IBM generates revenue directly on its site – or, more broadly, that it generates value from operating a well-functioning, highly-trafficked Web site – it is likely that this value is enhanced by its internal infringement of the patents-in-suit." (D.I. 392 Ex. 2 at 82.) But that simple statement does not amount to a damages theory. (*See id.* at 7 ("IBM has used its own technology to manage its own Website, which I have estimated generates ███

Some of the language Mr. Bone used could, if viewed in isolation, be construed as the conclusion of a damages theory. For example, he states that "the incremental profit contribution of the patents-in-suit to IBM's online revenue could be as much as ▇▇▇ ▇▇▇" (D.I. 392 Ex. 2 at 102.) But that is a conclusion only, and assertion alone is not enough. Moreover, when his statements are viewed in context, it is clear that Mr. Bone viewed IBM's use of its website as simply a factor that would allow Parallel Networks to bargain for a higher royalty rate for IBM's sale of the accused products. (*See id.* at 100-03 (arguing that Parallel Networks would have a better bargaining position based on the value IBM derives from using the accused products to host its website and support online sales).)

Overall, it would not be proper to say that Parallel Networks has satisfied its obligation to explicate a damages theory related to IBM's use of its website. That Parallel Networks has tried to expand its theories in its late-filed supplemental report does not change that conclusion.

### B. Mr. Bone's Analysis Is Unreliable

Even if what is set out in Mr. Bone's report could be called a damages theory relating IBM.com, however, I would nevertheless grant the motion to exclude his report as unreliable under *Daubert*.

What Mr. Bone now claims is a damages theory is presented in three steps. First, Mr. Bone estimates the amount of revenue that can be attributed to IBM's use of its

---

▇▇▇▇▇▇▇▇ in revenue and over 30 million visits per month in traffic."); *id.* at 45 (recognizing that IBM derives value from using the accused products to host its website).

8

website. Second, he estimates the proportion of that revenue that can be attributed to the accused products. Then, he estimates the amount of money IBM would pay for a license to the patents-in-suit. Breaking those steps down, Mr. Bone reasons:

> (1) In 2006, "IBM generate[d] ▉▉▉▉▉▉▉▉▉ of 'Web-attributed' revenue."
>
> (2) ▉▉▉▉▉ multiplied by the number of hours per year "suggests annual IBM.com revenue of approximately ▉▉▉▉▉ in 2006."
>
> (3) In 2006, ▉▉▉▉▉ represented ▉▉▉ of IBM's total revenue. If the online share of IBM revenue stayed the same or grew larger, then one could estimate that "IBM[.com] generated company-wide revenue of ▉▉▉▉▉ during the damages period.
>
> (4) If the IBM website were down 0.5% of the time, IBM could lose 3.8% of its online revenue per year. That would amount to ▉▉▉▉▉▉▉ during the damages period.
>
> (5) IBM's use of the accused products "could reduce outages by 90% ... suggest[ing] that IBM's own products could allow it to avoid ▉▉▉▉▉ in potential loss during the damages period.
>
> (6) "Applying IBM's company-wide gross profit margin to this amount indicates a potential profit savings of ▉▉▉▉▉ during the same period."
>
> (7) "If the proportional value of the patents-in-suit to [the Accused Products] impact IBM internally in approximate proportion to their value in the software market more broadly, the incremental profit contribution of the patents-in-suit to IBM's online revenue could be as much as ▉▉▉▉▉ ... ."

(D.I. 392 Ex. 2 at 80-81, 102.) There are serious methodological and reliability problems with several of Mr. Bone's assumptions.

First, Mr. Bone assumes that the proportion of IBM's total revenue derived from online sales stayed the same or increased during the damages period. In defending his assumption, he explained that IBM.com sales of one product (Web Application Server) increased each year, and increased at a faster rate than non-website sales for the same



9

product. That explanation is insufficient. Mr. Bone has no basis to conclude that all of IBM's sales followed the same trends as IBM sales for one product. Another flaw with this assumption is that the data upon which Mr. Bone relied was from 2012 – the start of the infringement period. His analysis does not take into account how IBM's revenue might have changed after the infringement period began.

Second, Mr. Bone assumes, without adequate explanation or justification, that in the absence of the accused products, the IBM website would be down 0.5% of the time and that if the website were down 0.5% of the time, IBM would lose 3.8% of its annual web-based revenue. (*Id.* at 81 (citing D.I. 392 Ex. 2-2 at 3 n.5.) Mr. Bone apparently arrived at both the 0.5% and 3.8% figures from an internal IBM presentation. (*Id.* at 80-81.) That presentation, however, does not relate to the accused products, does not state that any website (let alone IBM's website) would be inoperable 0.5% of the time, and does not provide any basis for its conclusion that 0.5% downtime corresponds to a 3.8% reduction in revenue. (D.I. 392 Ex. 5 at 3.)[5]

Third, Mr. Bone applies IBM's company-wide gross profit margin to a small portion of IBM's business. He does not consider whether there might be a significant difference in profit margin for IBM's online sales than for the rest of IBM's business operations.

---

[5] Parallel Networks emphasizes that Mr. Bone obtained the 0.5% and 3.8% statistics from an internal IBM document. However, the fact that a document originated from IBM does not make the statistic immune to the requirements of Rule 702. *Cf. i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) (evaluating the reasonability and reliability of an expert opinion, notwithstanding the fact that the opinion was based on information derived from the defendant's internal documents).

Fourth, Mr. Bone assumes that the proportional value of the patents-in-suit to the accused products impacts IBM in approximately the same way that it impacts the software market in general. In doing so, he does not consider that IBM may well not be a typical or average player in the software market. As one of the largest companies in the world, IBM is not a typical software company. Because of its size, IBM likely has different needs when it comes to infrastructure, server resilience, sub-domains, and request routing. That means that expectations that may apply to the software market in general may not apply to IBM.

Any one of the flawed assumptions identified above would be sufficient to call Mr. Bone's damages conclusion into question. When all four flaws are viewed together, it seems plain that Mr. Bone's damages opinion fails to satisfy the standards articulated in *Daubert* and embodied in Federal Rule of Evidence 702.

## IV. Conclusion

For the foregoing reasons, IBM's motion to exclude the expert report of Mr. Bone (D.I. 382) is granted.